UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WANDA A. CABRERA-CARDONA,<br>    *Plaintiff*,<br>v.<br>DEPARTMENT OF LABOR, STATE OF CONNECTICUT<br>    *Defendant*. | No. 3:22-cv-00130 (MPS) |

**RULING ON MOTION TO DISMISS**

**I.    INTRODUCTION**

*Pro se* plaintiff Wanda Cabrera-Cardona, a Christian woman, brings this action against her former employer, the State of Connecticut Department of Labor, alleging that the Department subjected her to sex-, religion-, and disability-based discrimination in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. §§ 701, *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn Gen. Stat. §§ 46a-60 and 46a-70. The Department of Labor has moved to dismiss Cabrera-Cardona's complaint under Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons stated below, I GRANT the Department of Labor's motion to dismiss.

II.    BACKGROUND

A.    Factual Allegations[1]

On June 8, 2018, Cabrera-Cardona, a Christian woman, ECF No. 1-1 at 5, 7, employed by the State of Connecticut Department of Labor as a Career Development Specialist, Def. Ex. A, ECF No. 17-2 at 3, was "scheduled to conduct needs assessments at the American Job Center" ("AJC") Career Center in Hamden, Connecticut, ECF No. 1-1 (Exhibit) at 6; ECF No. 17-2 at 4.[2] After going to check the "roster binder" that morning and then glancing away from it, Cabrera-Cardona observed co-worker James Hally viewing "a slideshow of women in lingerie" "on his assigned computer," ECF No. 17-2 at 4; ECF No. 1-1 at 6. From where she was standing approximately 12 feet away, Cabrera-Cardona could see "four different screens in the [slideshow,] each showing women in sensual garments in red, white, black and pink." *Id.* Cabrera-Cardona confronted Hally about the images. Hally "apologized[,] saying that he did not know that anyone was there." ECF No. 17-2 at 4. Cabrera-Cardona "walked away…and documented [the incident] on a white lined paper." ECF No. 1-1 at 6. No supervisors were available at the time, so Cabrera-Cardona continued working with clients until that afternoon, when PSC Lorna McLeod and PSC/Union Steward Antoinette Petrillo arrived. *Id.* Cabrera-Cardona, McLeod, and Petrillo met in director Angel Rivera's office, where Cabrera-Cardona

---

[1] I accept the following facts, taken from the Complaint (ECF No. 1), as true for purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). I also consider facts taken from the exhibit attached to the plaintiff's complaint, which the Complaint references throughout and describes as a "6-page document" the Plaintiff presented to HR, Pl. Compl. at 3, and documents from a companion case attached as exhibits to the Department's motion. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.") (internal citations and quotation marks omitted); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court…may refer to evidence outside the pleadings.").
[2] I use ECF numbers when citing documents in the record.

2

recounted the incident, adding that "[Hally] stopped watching it when I called him out on it," and suggesting that "they could have the computer checked by IT." *Id.* at 6-7.  McLeod and Petrillo asked Cabrera-Cardona to show them the computer Hally had been using, which Cabrera-Cardona did, discreetly, before returning to her workstation.  *Id.* at 7.

When Cabrera-Cardona returned to work from bereavement leave a few days later on June 12, she observed that Hally was still working in the Career Center.  *Id.* at 7.  Cabrera-Cardona followed up with Petrillo on June 14 asking about the status of her report.  *Id.*  Petrillo responded, "It's just like [McCleod] said, it was just a misunderstanding."  *Id.*

Cabrera-Cardona "continued to work between the AJC in Hamden and in New Haven."  *Id.*  She alleges that she saw Hally "standing and staring at [her]…over the 5' partitions" of the staff cubicles near the Career Center "many times" during this period.  *Id.*  Cabrera-Cardona also alleges that Hally approached her on two occasions in ways that made her feel anxious.  *Id.*  The first encounter took place at a time not specified other than being described as "[a] few weeks later."  *Id.*  Cabrera-Cardona had been asked to assist a Spanish-speaking client and was at her workstation gathering information for the client when Hally "stood by the entrance of [her] workstation" and alerted her that someone needed assistance in Spanish*. Id.*  Cabrera-Cardona responded, "I know, I'm working with him."  *Id.*  She then reported this encounter to Rivera and McLeod, explaining that Hally "approached the entrance of [her] workstation and that it wasn't right," that she didn't feel comfortable working with him, and that she didn't want him near her.  *Id.*  Rivera told Cabrera-Cardona that he couldn't prevent Hally from being near her, and that she "need[ed] to forgive."  *Id.*  Cabrera-Cardona was "taken aback" because Rivera knew she was a Christian.  *Id.*  Rivera also informed Cabrera-Cardona that the AJC was installing cameras due to the issue of computers being used to access "inappropriate sites."  *Id.*

The second encounter took place on September 5, 2018.  *Id.* at 7-8.  Cabrera-Cardona alleges that while she was "stationed…at the front desk" "taking care of a client," Hally "came over to [her] area from [her] left side,…stood over [her] and extended his right arm over [her] keyboard, near [her] face, and reached over to grab a [blank ID] card located under [her] monitor."  *Id.*  Cabrera-Cardona stopped typing and looked at him but did not look at his face or say anything.  *Id.* at 8.  She reported this encounter to McLeod and Rivera "immediately."  *Id.* at 8.  Rivera informed Cabrera-Cardona a few days later that he had spoken with Hally's supervisors and assured her it wouldn't happen again.  *Id.*

Cabrera-Cardona continued to work between the New Haven and Hamden offices, where she was at times assigned to work in the Career Center with Hally.  *Id.*  Cabrera-Cardona does not allege Hally ever spoke to or approached her again.  *See id.* at 8-11.

On December 19, 2018, Cabrera-Cardona was "verbally attacked by a client in New Haven."  *Id.* at 9; *see also* Def. Ex. A, ECF No. 17-2 at 8.  She filed an incident report regarding the attack.  *Id.*  At some point later that month, Cabrera-Cardona again met with McLeod and Rivera and explained that she did not feel safe in either the New Haven or the Hamden office.  *Id.* at 10.  Rivera told Cabrera-Cardona at this meeting that "based on his investigation," Hally had done nothing wrong, and also that IT would be installing security measures on the computers to manage pop-ups.  *Id.*  In response, Cabrera-Cardona reiterated "the two other incidents with [Hally]" when he approached her desk.  *Id.*  Both supervisors responded that he had done nothing wrong.  *Id.*  Cabrera-Cardona subsequently requested a transfer out of the Department of Labor and into another state agency.  *Id.*  The complaint does not indicate whether Cabrera-Cardona pursued this transfer request further.

4

On December 24, Cabrera-Cardona called out of work; she "felt anxious and sick" because she knew she would be working near Hally.  *Id.*  In January of 2019, Cabrera-Cardona "submitted a six-page formal written complaint to HR and to Local 269 Union Vice President, Marsha Tulloch, detailing all the harassment and incidents."  ECF No. 17-2 at 10.  Cabrera-Cardona also provided an oral statement to Human Resources.  *Id.*

On January 9, 2019, Cabrera-Cardona went on "[Family Medical Leave Act ("FMLA")]-Mental Health issues" leave, where she remained until October 16, 2019.  ECF Nos. 1 at 3; 17-2 at 10.  On September 11, 2019, Cabrera-Cardona's therapist "opined" to the Department of Labor that she "would be 'unable to return to work in the same work environment' and that [she] would be able to return to selective work on February 2, 2020, if [she] had a different working environment."  ECF No. 17-2 at 10.  After being asked by the Department of Labor to clarify Cabrera-Cardona's mental health restrictions on September 12, 2019, Cabrera-Cardona's therapist wrote on September 23, 2019, that Cabrera-Cardona "could not return to work in New Haven or Hamden as the Hamden office is the location that exposed [her] to the individual that triggered [her] PTSD.  [Her] therapist further stated that" returning to the Hamden office would be "inappropriate" due to her anxiety and that because "there have been other incidents of violent outbursts which does not ensure [her] safety,…[her] return to either Hamden or New Haven is restricted."  ECF No. 17-2 at 10-11.  In response, on or around October 30, 2019, the Department of Labor offered Cabrera-Cardona a choice between returning to her job working between the two AJC offices "while [Hally] was still in one" of those offices or taking a demotion.  *Id.* at 11; ECF No. 1 at 3.  She was also offered employment with another State agency.  *Id.*  Cabrera-Cardona elected to resign from her position, however, because she "mistrusted working for the

State of [Connecticut]." *Id.* Her notice of resignation, dated January 31, 2020, stated the following:

> Good afternoon, Mr. Griffin,
>
> I'm writing to inform you that, as recommended by my mental health therapist, I am resigning from my position effective immediately. I feel that I am left with no choice in light of my recent experiences of a hostile work environment that you have not remedied, making my work environment unsuitable.
>
> I have attached my most recent doctor's note, which states that it is not in my best interest to return to work at the Department of Labor, due to the fact that my anxiety will continue to be exacerbated and the environment would further traumatize me while I try to heal.
>
> Thank you,
> Wanda Cabrera-Cardona

Def. Ex. E, ECF No. 17-6.[3] A letter from a practitioner at the Franciscan Life Center dated January 30, 2020, attached to Cabrera-Cardona's notice of resignation and referenced therein, repeated the same allegations contained in Cabrera-Cardona's resignation notice and further explained that "[a]lthough the person involved has been reassigned to a different location,[4] the setting, the lack of trust in her director and supervisors, and the lack of security in the premises would prohibit [Cabrera-Cardona] from being successful in her work." Def. Ex. E, ECF No. 17-7.[5]

---

[3] Cabrera-Cardona filed this notice, which Defendant includes as an exhibit to its motion to dismiss, on the docket in consolidated case *Cabrera-Cardona v. Labor*, Dkt. No. 3:22-cv-00131-MPS. *See Cabrera-Cardona v. Labor*, Dkt. No. 3:22-cv-00131-MPS, ECF No. 1-1 at 4.
[4] This statement from Cabrera-Cardona's healthcare provider conflicts with the allegation in Cabrera-Cardona's complaint that the Defendant "never did anything to remove [Hally]." ECF No. 1 at 3. I will nonetheless assume for purposes of this motion that the Department of Labor did not reassign Hally to a different location.
[5] Plaintiff filed this letter on the docket in the companion case, *Cabrera-Cardona v. Labor*, Dkt. No. 3:22-cv-00131-MPS at ECF No. 1-1 at 5.

## B. Procedural History

After Cabrera-Cardona filed this action asserting claims of employment discrimination based on her sex, religion, and disability against the Department of Labor, this case was consolidated with a companion case, *Cabrera-Cardona v. Labor*, Dkt. No. 3:22-cv-00131-MPS, in which she makes the same allegations. Counsel for the Department of Labor appeared and filed the motion to dismiss. I then gave Cabrera-Cardona an opportunity to amend her complaint to address the alleged defects discussed in the Department of Labor's memorandum of law. ECF No. 18. Cabrera-Cardona did not amend her complaint; instead, she filed a one-page response to Defendant's motion summarily opposing each of the Department of Labor's arguments and "agree[ing] with the exhibits" attached to its motion. ECF No. 26. The Department of Labor subsequently filed a reply brief. ECF No. 27.

## III. LEGAL STANDARD

A federal court must dismiss a complaint under Rule 12(b)(1) of the Rules of Civil Procedure when it lacks subject matter jurisdiction and under Rule 12(b)(6) when the plaintiff has failed to state a claim upon which relief can be granted. Fed R. Civ. P. 12(b)(1), 12(b)(6). "When considering a [Rule 12(b)(1)] motion to dismiss for lack of subject matter jurisdiction or [a Rule 12(b)(6) motion] for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (internal citation omitted). This tenet does not apply to legal conclusions. *Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(1) motion, as well as on a Rule 12(b)(6) motion, a court must draw all reasonable inferences in the nonmoving party's favor. *See, e.g.*, *McGinty v. State*, 193 F.3d 64,

68 (2d Cir. 1999) (discussing Rule 12(b)(1)); *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011) (discussing Rule 12(b)(6)).[6]

"To survive a [12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (internal citations omitted). For *pro se* cases, the Court is "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

## IV.   DISCUSSION

The Department moves to dismiss Cabrera-Cardona's ADA and CFEPA claims for lack of subject matter jurisdiction based on the Eleventh Amendment and sovereign immunity, and her remaining Title VII claims and her Rehabilitation Act claims for failure to state a claim. ECF No. 17-1 at 1. The Department also argues that Cabrera-Cardona's Title VII and Rehabilitation Act claims are time-barred. *Id.* Cabrera-Cardona does not substantively respond

---

[6] "The Second Circuit has not always been clear on this point with respect to Rule 12(b)(1) motions, stating, at times, that on a Rule 12(b)(1) motion, the court should *not* draw inferences in the pleader's favor. *Compare McGinty v. State*, 193 F.3d 64, 68 (2d Cir. 1999) (in reviewing dismissal under Rule 12(b)(1), 'we must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to plaintiffs') *with Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ('[W]hen the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.') and *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) ('On appeal of the district court's order on the motion to dismiss [under Rule 12(b)(1)], we must accept as true all material factual allegations in the complaint, but we are not to draw inferences from the complaint favorable to plaintiffs.'). In *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), the court suggested that these different statements were reconcilable, although it did not explain how: "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff [on a Rule 12(b)(1) motion], 'but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'' *Id.* at 170." In this ruling, I take as true the allegations in Cabrera-Cardona's complaint and draw all reasonable inferences in her favor.

to any of these arguments.  *See* ECF No. 26.  For the reasons discussed below, I grant the Department's motion to dismiss.

**A.     ADA Claims**

The Eleventh Amendment guarantees that "nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001).  "This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  There are two exceptions to the Eleventh Amendment bar.  First, "[a] sovereign's immunity may be waived." *Id.* at 99.  In other words, "a State may consent to suit against it in federal court." *Id*.  Such a waiver must, however, be "unequivocally expressed," *id.*, and "Connecticut has not waived its immunity from suit under Title I of the ADA," *Lee v. Dep't of Child. & Fams.*, 939 F. Supp. 2d 160, 165 (D. Conn. 2013).

The second exception permits Congress to abrogate "States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Garrett*, 531 U.S. at 363 (internal quotation marks and alteration omitted).  To determine whether Congress intended to abrogate the States' immunity, a court must ask "two questions: first, whether Congress has unequivocally expressed its intent to abrogate the immunity; and second, whether Congress has acted pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55 (1996) (internal alterations and citations omitted).  After finding that Congress had not validly abrogated the States' Eleventh Amendment immunity from suit under Title I of the ADA, the Supreme Court in *Garrett* "concluded that the Eleventh Amendment bars private suits seeking money damages for state violations of Title I of the ADA." *Tennessee v. Lane*, 541 U.S. 509, 514 (2004).  Because it is an arm of the state, the

9

Department of Labor is also afforded immunity. *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429–31 (1997) (internal punctuation omitted). I therefore dismiss Cabrera-Cardona's ADA claims under Rule 12(b)(1) as barred by the Eleventh Amendment.

**B.    CFEPA Claims**

The Department argues that Cabrera-Cardona's CFEPA claims under Connecticut General Statutes §§ 46a-60 and 46a-70 ("CFEPA") must also be dismissed under the Eleventh Amendment. I agree.

The State of Connecticut "has clearly waived immunity to claims brought under CFEPA as to cases brought in the Connecticut state courts." *Lyon v. Jones*, 168 F. Supp. 2d 1, 6 (D. Conn. 2001 (citing Conn. Gen. Stat. § 46a–99). "However, …there is nothing in the Connecticut General Statutes that constitutes an express waiver of Eleventh Amendment immunity for CFEPA claims." *Id.*; *see also Daniels v. Connecticut*, 2015 WL 4886455, at *19 (D. Conn. Aug. 17, 2015) (recognizing same). The Supreme Court "consistently has held that a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Pennhurst*, 465 U.S. at 99 n. 9. "[B]ecause Connecticut has not consented to suit in federal court under CFEPA," *Wagner v. Connecticut Dep't of Correction*, 599 F. Supp. 2d 229, 237 (D. Conn. 2009), Cabrera-Cardona's CFEPA claims—alleging discriminatory employment practices in violation of § 46a-60 and a violation of the guarantee of equal employment in state agencies under § 46a-70—are likewise barred by the Eleventh Amendment and must be dismissed.

**C.    Title VII Claims**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In keeping with the "obligation" to construe a *pro se* plaintiff's complaint liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), I construe Cabrera-Cardona's complaint as having asserted a Title VII disparate treatment claim on the basis of her religion and her sex, and a Title VII hostile work environment claim. ECF No. 1 at 3. Each of these claims is addressed below.

**1.     Disparate Treatment**

To state a disparate treatment claim under Title VII, "a plaintiff must plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015). "Examples of adverse actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities....'" *Atkins v. Rochester City Sch. Dist.*, 764 F. App'x 117, 119 (2d Cir. 2019) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). At the pleadings stage, "the plaintiff's burden is minimal—he need only plausibly allege facts that provide at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Vega*, 801 F.3d at 86–87 (internal quotation marks omitted).

The Department argues that the allegations in Cabrera-Cardona's complaint fail to "identify *any*…adverse employment actions taken by the Defendant" or support an inference "that any such action was connected to her [sex or religion]." ECF No. 17-1 at 22 (emphasis in original). In a complaint filed with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), Cabrera-Cardona indicated that she was "[f]orced [by the Department of Labor] to take a demotion." ECF No. 17-2 at 1. Ordinarily, this would constitute an adverse

employment action. *See, e.g., Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015) (finding that plaintiff's "demotion constitutes an adverse employment action"). However, the factual allegations in Cabrera-Cardona's complaint indicate that Cabrera-Cardona was also offered the options of returning to work in the same position at the same location or taking a position with a different state agency. *See* ECF No. 1 at 3. According to her complaint, she turned down even the offer of working for a different state agency and instead chose to resign because she "mistrusted working for the State of [Connecticut]." *Id.* These factual allegations do not suggest she was demoted; rather, they suggest that a demotion was one of three choices offered to her – apparently the only one that would have allowed her to continue working within the Department of Labor but at a different location where Hally would not be present.[7] Furthermore, the allegations in her complaint related to the choices offered to her make no reference at all to her sex or her religion. *See* ECF No. 1-1 at 7. There is no suggestion that the choices offered for her return to work, including the "voluntary demotion," were motivated by her sex or her religion. Therefore, I must dismiss any Title VII disparate treatment claim.

**2.   Hostile Work Environment**

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, ... creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's" protected status. *Patane v. Clark*,

---

[7] Admittedly, Cabrera-Cardona's allegations are muddled on this point. The complaint suggests she was offered three options: (1) "return to work in the same location," which would have involved working near Hally; (2) "take a demotion;" or (3) "employment in another agency." ECF No. 1 at 3. The CHRO affidavit suggests, however, that the "voluntary demotion" would still have involved work in proximity to Hally. ECF No. 17-2 at 11. In any event, Cabrera-Cardona unequivocally alleges that she chose to resign from state employment altogether because she "mistrusted working for the State." ECF No. 1 at 3; *see also* ECF No. 17-6 at 11 (noting that she was resigning because it was "not in [her] best interest to return to work at the Department of Labor.").

508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). Determining whether a work environment is objectively severe or pervasive requires an assessment of the totality of the circumstances. *Id.* "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Id.* (internal citations and quotation marks omitted).

"As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal citations and quotation marks omitted). However, "it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374. "In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Id.* (internal quotation marks omitted).

Cabrera-Cardona alleges that on one occasion, she observed a co-worker while he was watching a "slide show of women in lingerie" on his work computer. ECF No. 1-1 at 6. The Second Circuit "has specifically recognized that the mere presence of pornography in a workplace can alter the 'status' of women therein and is relevant to assessing the objective hostility of the environment," *Patane*, 508 F.3d at 114, and the same is true of the types of images being viewed by the co-worker, regardless of whether they are deemed pornographic.

13

Further, as in *Patane*, the facts alleged by Cabrera-Cardona show that the Department of Labor failed "to take any action notwithstanding Plaintiff's numerous complaint[s]," *id.*, which at least "preserved the very circumstances that were the subject of [her] complaint." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) (noting that "the [employer's] failure to investigate did not by itself alter the terms and conditions of [plaintiff's] employment."). But unlike in *Patane*, Cabrera-Cardona has failed to allege facts sufficient for me to infer either that Cabrera-Cardona's observation of Hally's viewing lewd images on his computer was so severe as to "alter the conditions of her working environment," *Alfano*, 294 F.3d at 374, or that that incident combined with the other two incidents in which Hally approached her were so severe or pervasive. The three incidents took place over the course of three months; each involved only a brief interaction; none involved any threats, physical intimidation, or insults; and the final two incidents were so mild that they likely would have been considered entirely unremarkable had the first incident – and Cabrera-Cardona's complaint about it – not occurred. Even when Cabrera-Cardona's allegation that Hally was "staring" at her over the partitions "many times" is added to the mix, the conduct when considered in its totality still comes up far short of "severe" or "pervasive." Without more, therefore, I must dismiss any hostile work environment claim Cabrera-Cardona may be asserting.[8]

---

[8] Cabrera-Cardona's allegations about the verbal attack by the client and not feeling safe in the wake of that attack do not appear to have any connection to Hally or to any action or inaction by the Department. Nor do those allegations appear to be connected to her sex or her religion. So those allegations do not contribute to her hostile work environment claim. Finally, to the extent Cabrera-Cardona also asserts a constructive discharge claim, that claim fails as well. The claim of constructive discharge requires a showing beyond the elements of a hostile work environment claim. *See, e.g.*, *Tepperwien v. Entergy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427, 436. 447 (S.D.N.Y. 2009) (the plaintiff's claim for sexual harassment overcame a motion for summary judgment but his claim for constructive discharge did not). "[C]onstructive discharge . . . can [under some circumstances] be regarded as an aggravated case of[] sexual harassment or hostile work environment. . . A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 131 (2004). Because the conduct alleged here was not so severe or pervasive as to alter the conditions of the work environment, it also did not make those conditions so intolerable that a reasonable person would have felt compelled to resign.

D.       **Rehabilitation Act Claims**

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). "[R]egulations promulgated under the Rehabilitation Act by the Department of Health and Human Services require recipients of federal funds to 'make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped ... employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.'" *Quadir v. New York State Dep't of Lab.*, 39 F. Supp. 3d 528, 538–39 (S.D.N.Y. 2014) (quoting *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir.1995)).

In this Circuit, "[a] plaintiff may base her [Rehabilitation Act] discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016). "To state a claim for disparate treatment based on a disability under the Rehabilitation Act, a plaintiff must demonstrate that: (1) she is disabled within the meaning of the Act; (2) she was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; (3) she suffered an adverse employment action due *solely* to her disability; and (4) her employer receives federal financial assistance." *Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 390 (E.D.N.Y. 2016) (emphasis in original) (internal quotation marks omitted). "To establish a prima facie case under a disparate impact theory, [a] plaintiff must demonstrate (1) the occurrence of certain outwardly neutral practices, and (2) a

significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (internal quotation marks omitted). Finally, "[t]o establish a prima facie case of discrimination based on an employer's failure to accommodate a disability, under…the Rehabilitation Act, a plaintiff must demonstrate that (1) the plaintiff is a person with a disability under the meaning of the [Act]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019) (internal citations, alterations, and quotation marks omitted). As each theory requires that a plaintiff plausibly allege she is a "qualified individual with a disability," *Mount Vernon Sch. Dist.*, 837 F.3d at 158, I begin the analysis of Cabrera-Cardona's Rehabilitation Act claims there.

"Both the ADA and the Rehabilitation Act define 'disability' as '(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.' 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B)." *Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 390–91 (E.D.N.Y. 2016).[9] As discussed below, Cabrera-Cardona has failed to plead facts sufficient to establish she suffers from a disability within the meaning of the Rehabilitation Act under any of these three categories.

---

[9] "Congress has directed that courts look to the provisions of the ADA, 42 U.S.C. § 12111 *et seq.*, when adjudicating [Rehabilitation Act] section 504 claims of employment discrimination." *Williams v. MTA Bus Co.*, 44 F.4th 115, 124 (2d Cir. 2022) (citing § 794(d) of the Rehabilitation Act).

Although Cabrera-Cardona has sufficiently alleged that she suffered from mental impairments, she has not alleged any facts suggesting that her mental impairments substantially limit any of her major life activities. *See, e.g., Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 391 (E.D.N.Y. 2016) ("To establish that she suffers from an actual disability, a plaintiff must: (1) show that [s]he suffers from a physical or mental impairment; (2) identify an activity claimed to be impaired and establish that it constitutes a major life activity; and (3) show that [her] impairment substantially limits the major life activity.") (internal quotation marks omitted). "Major life activities" "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The factual allegations in Cabrera-Cardona's complaint suggest only that her mental impairments left her unable to work a job in the same location as Hally. For instance, Cabrera-Cardona's CHRO complaint, attached as an exhibit to the Defendant's motion, alleges that she suffers from "PTSD, anxiety, and depression," ECF No. 17-2 at 1, and explains that she "sought help from a mental health professional, Sister Barbara Johnson, as the [Defendant's] lack of action has caused an exacerbation of [her] PTSD, anxiety and depression" and that her "workplace anxiety had been exacerbated by Hally's conduct and the DOL's lack of any remedial measures to protect me from further harassment from Hally." ECF No. 17-2 at 6. But "[a]n impairment that disqualifies a person from only a narrow range of jobs," here, a position working in the same vicinity as Hally, "is not considered a substantially limiting one." *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (where evidence in record showed plaintiff's asthma prevented her from working in only one area of the hospital (the blood bank), and not the entire hospital, no reasonable juror could find she suffered from a

disability). Without more, these allegations "do not make plausible that [s]he was substantially limited in the major life activity of working." *Freeman v. Kirisits*, 818 F. App'x 34, 40 (2d Cir. 2020); *see also Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020) (recognizing the "longstanding, common-sense principle of law…that employees who are precluded only from doing their specific job, or from working under a specific supervisor, do not have a 'disability.'")

Cabrera-Cardona's "failure to plausibly allege a substantial limitation to a major life activity…precludes her from asserting that she has a record of disability," the second category of disability recognized under the Act. *Kelly*, 200 F. Supp. 3d at 394. And Cabrera-Cardona has not plausibly alleged that she was "regarded as having such an impairment," which applies "'if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" 42 U.S.C. § 12102(3). There are no allegations in her complaint suggesting that the Department took any action because it perceived that she had a mental impairment. Because Cabrera-Cardona has failed to plausibly allege she is a qualified individual with a disability under the Act, any Rehabilitation Act claim must fail.

Even if she had adequately alleged a disability, her Rehabilitation Act claim would still fail under any of the three theories of liability outlined above. Cabrera-Cardona has not alleged any facts suggesting that the Department took any action "because of" her mental impairments – which is fatal to any disparate treatment claim. Nor has she alleged any facts about "outwardly neutral practices" or any "significantly adverse or disproportionate impact on persons of a particular type" that would support a disparate impact claim. As for any failure-to-accommodate claim, Cabrera-Cardona has failed to allege any facts supporting the final two elements of a

prima facie case. Her complaint does not contain a single allegation regarding the essential functions of her job or any other job, a request for reasonable accommodation made to the Defendant, or the Defendant's refusal of that request. In fact, Cabrera-Cardona alleges in her complaint that the Department did try to accommodate her by offering her two alternatives to returning to her previous position: a demotion and a job with a different agency. ECF No. 1 at 3. While perhaps neither was satisfactory to her, she has failed to allege that these alternatives were not reasonable accommodations under all the circumstances. For example, she has not alleged any facts about the existence of other positions within the Department at her level and involving her skillset that were available at other locations. And any failure-to-accommodate claim also fails for the independent reason that, ultimately, she did not want to be accommodated: she resigned, refusing even the offer of employment with another agency, because she did not trust the State. ECF No. 1 at 3. Therefore, the Defendant's motion to dismiss must be granted as to her Rehabilitation Act claims.

## V.   CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss the Plaintiff's complaint [ECF No. 17] is GRANTED.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            December 19, 2022